Good morning, Your Honor. Michael Lauder for the plaintiff appellant, Peter Fugawa. And I would like to reserve five minutes for rebuttal. Your Honor, we think that the district court aired in granting summary judgment to the state here. Viewing the facts in light most favorable to Fugawa, a reasonable jury could find that Dearmond used excessive force in violation of the Eighth Amendment, and that it was a violation of a clearly established right. And I think this all arises, I know there's five Hudson factors to go through for the Eighth Amendment claim, but I think there's really three sort of categorization errors that the district court and the magistrate made. Not in going through the specific facts themselves, but it seems sort of similar to me as I think about this kind of like the form that was filled out for the intake when Mr. Fugawa got into the Pleasant Valley State Prison that day. They had to take the messy real world facts and put them into these boxes, one of four boxes on the form. I think what the judge below is doing is kind of similar to that. In particular, fitting the facts into the categories made three errors I think that should mandate reversal. One of those is characterizing Fugawa's behavior as disobeying an order with physical resistance and physically resisting an escort. And that was a big, obviously a big factor in coming out the way they did on the Hudson factors and also in the qualified immunity analysis. I think it's an error to say that he's disobeying an order because of the timing. If you view the facts in the light most reasonable to Mr. Fugawa, what he did when he came in was Officer Villa or Villa told him to go. I said, I think I see a potential incompatibility here. Why don't you go check with your cellmate? He did, he came back, reported that there was in fact an incompatibility and he understood from both Villa and from the go-between rater that a different cell assignment was in the works. And this is not an unreasonable understanding because it is actually the cell assignment that he ended up getting that same night that he thought was in the works. So then when he, at the end of the shift, he encounters another representative of the bureaucracy here of the institution that has to operate through different people. He encounters another person, D.R. Mond, and he's telling him to go to cell 128. I just, I don't really know where you're going with this actually. I'm just saying he's confused. He absolutely resisted a lawful order to get in the cell. The inmates are not entitled to just decide when they feel like going in a cell if they're given an order. Your argument is just that the force that was used to gain his compliance was excessive under the circumstances, right? It was excessive, Your Honor. Right. So that's, why don't you focus on that? Because I don't, all this lead up about whether he was resisting. Okay, well, I'm just saying that that shows. He was told, get your ass in the cell or I'm going to slam your face into the ground. And he refused to go. And then his face was slammed into the ground. So the question, it seems to me, is whether the slamming of his face into the ground was permissible or not under the circumstances. Right. If you say it wasn't, they say it was. I agree. That's the question. So I was giving too much background, I understand. I just was showing that he was confused, Your Honor. That doesn't matter. Well, I think it matters because here he was given an order. I think Judge Watford's telling you that it doesn't matter. All that matters is what did the officer do when there was noncompliance? Well, under Fugawa's version of the facts, so I think timing is important. That's what I'm trying to say, is that he did initially refuse an order of D-Armand to go into cell 128, yes. And then after that, D-Armand said, okay, why don't you cuff up and I'll take you to administrative segregation. That's Fugawa's testimony. So he says, okay, turns around, puts his hands behind his back. Now the order, as far as he understands it, is that he is going to go to administrative segregation, not to cell 128. And then under Fugawa's testimony, he is then just shoved towards the cell. So he wasn't actually given an order to go to cell 128. And his resistance is merely out of confusion. This is not what I was ordered to do. I thought I was going to ADSEG. Now I'm being pushed towards his cell. He plants his feet because he is confused. And I think if you call that an order and that shoving without explaining what you're doing an escort, it's just, it's taking the facts and like putting them into a category where it just doesn't belong. It's kind of like digging a rotten apple core out of the trash and saying, here, this is an apple, eat this. It's just, it doesn't fit. I thought your strongest piece of evidence was the threat made just before the takedown. Right, and I think- And it was, so that's what I'm saying. There was an order. It was, you better get in the cell right now and stop digging your feet into the ground or else, and then the, or else followed. So he was, and- Well, he's threatening him. He starts pushing him. And then after he starts pushing him, he threatens him. And I think this- Isn't that an order? I think that's the question. How is the threat not, I mean, you could call it a threat, but isn't it also an order? I think there's an issue of how much time he had after the threat. What the testimony is that he, you know, threatens the body slam. Wallace, his partner, says that's not necessary. And then immediately after, he throws him on the ground. So I think if you follow Fugawa's testimony, he didn't really have a chance to respond to that. You know, he starts getting pushed, his arm's being twisted. Someone shouts that he's gonna beat him up. You know, he's gonna body slam him and then does that. But there's not, it happened so fast that he didn't really have a chance to respond. And I think it is, this is why I was trying to say he was confused. I think it's relevant that he's confused on one level because he's heard different things about where he's going. And then more immediately from Mr. D. Armand, he's heard that, hey, I'm gonna take you to ADSEG and I'm putting you here. And then, you know, now he's threatening to beat him up. I think, you know, the state makes a lot of what a reasonable officer would believe. And I think a reasonable person being pushed by someone in contradiction to what they just told him would also be a little confused. And might want to plant their feet and try to figure out what was happening. So I don't, I don't think you want to die on that hill. I think what you really want to do is to focus on the officer's response when the officer believed that Fugawa was being non-compliant. The officer's response when he, right. Yeah. So under Fugawa's testimony, his response was he was going to take him to administrative segregation and then immediately decided to kind of use that as a ruse in a way to slam him to the ground, which I think is relevant. It didn't actually accomplish anything. He never actually ended up in cell 128. Slamming someone to the ground doesn't, just as a sort of a matter of inference, it's not pushing him towards the cell. It doesn't really achieve anything other than just to cause harm to Fugawa. And I think if you view his threats. Well, I said threat, they don't, your opponent doesn't agree that it was a threat. Right. I just was trying to be charitable to you. Right. And say that. Which I think you have to be in this. Exactly, so yeah, maybe a reasonable jury could interpret that as a threat that was then very much carried out, you know, and that would probably meet the eighth amendment standard, right? If, I mean, that's, I just don't know why you're dancing around the core issue is just really whether the, in fact, the amount of force that was used here was done just for the deliberate purpose of inflicting whatever that standard is that Judge Friendly so helpfully gave us. Right. And they say that, no, it wasn't. It was just a, the officer was met with physical resistance and he's entitled to use some level of force to overcome that. And that's all that happened here. Well, I'm a terrible dancer, your honor. So I didn't mean to dance at all. What I mean to say is that the timing affects the amount of force that was reasonable. So I think if he had used some force when he said, go to your cell and go to cell 128 and gave a clear order and Fugao had not done that and then immediately just tried to use some force, that would be different. That's a different case than what Fugao's testimony is here. He gave a clear order and then he gave instructions to do something else, take him to administrative segregation, and then just started shoving him towards the cell. So I think that, you know, I think he's not trying to achieve a lawful objection. But I think that the standard is you can use reasonable force to try to achieve a lawful- Lawful objective to bring an inmate to the cell. It's not a lawful objective to punish the inmate by slamming the inmate's face into the ground. And I think what Judge Wattsberg's been telling you for now nine minutes is you really ought to focus on that. Okay. So I think that issue may have actually been, we may have driven that into the ground. So what case law clearly established that what D'Armand did in this situation violated the Eighth Amendment? What cases clearly established? Well, I think the best cases, Your Honors, are probably Hudson and Wilkins. But I think also, you know, the magistrate were similar. There's a, Hudson involved some use of force during an escort. And Wilkins had a somewhat similar fact pattern. But I think also the magistrate in the ruling refers to California Code of Regulations section. And I think that is also relevant. And- What federal constitutional case law clearly established that what D'Armand did violated the Eighth Amendment? It has nothing to do with the California Code of Regulations or nothing state law. What federal law clearly established? I think, I was referring to the Code of Regulations because that's what the magistrate referred to. But the federal law, I think Hudson v. McMillan where violence was visited upon the inmate Hudson when he was being escorted by two guards. Kind of similar situation is here. He had his arm shackled behind his back. You know, one prisoner, two guards, same kind of fact pattern is here. Is there any evidence about what alternative kinds of force were available? I mean, this leg thing that they did that took him down. Do we know that that's not considered a smaller level of force than other options in the range of options? I think what they could have done, I mean, they could have, I don't know, Your Honor. I don't have an exact answer for what less amount of force they could have used, but I think- Because there's no testimony here, right? Is there about like the range of options to a prison guard in this situation where we can like rank them in terms of where this fits in Hudson about like how severe the reaction was to the resistance? We don't have like an expert on prison force and the options here, right? Right, that's correct. I think that all I can say about that is that that's right. But I think the premise, and this is what I was talking about earlier, is that there was an order to go to the cell outstanding. And I don't think there was, is our points. And therefore, there was no force was necessary. Why don't you save your remaining three and a half? Okay, thank you, Your Honor. Great, okay, let's hear from counsel for the defendant. Good morning, may it please the court. My name is Lucas Hennis and I represent Defendant Apelli D'Armond in this case. We're asking this court to affirm the lower court's grant of summary judgment for the following three reasons. First, the undisputed facts clearly establish that Officer D'Armond's use of force under the circumstances was not excessive. Second, Officer D'Armond was entitled to qualified immunity from Mr. Fugawa's claims. And third, the lower court correctly entered judgment on the state law claims based on its previous findings of law. Now, as my counterpart here pointed out, the standard on Eighth Amendment excessive force is the Hudson factors, specifically to determine whether the force was applied in a good faith effort to maintain or restore discipline, or to maliciously and sadistically for the very purpose of causing harm. And to determine that. So is slamming somebody's face into the ground a good faith effort to restore discipline? Your Honor, we first of all don't actually characterize the, we dispute that characterization that he was slammed. That's what he said. That is what he has said. You can't dispute that at this posture, right? I mean, we have to take his allegations as true, don't we? Yes, Your Honor. We do have to take his factual allegations as true. So why are you saying we dispute that? It's mostly a term, slam versus whether he was taken to the ground, Your Honor. So I, the officer says, I'm gonna slam your face to the ground. And if he had left it at that, then it's just an idle threat. But then the officer tripped Fugawa, whose hands were handcuffed behind his back, tripped him forward. And isn't it, couldn't a reasonable jury conclude that what the officer was actually trying to do at that point was to do exactly what he threatened to do, which is to slam Fugawa's face into the ground? Yes, Your Honor, that is true. So then you lose on the merits and then you have to retreat to qualified immunity. Is that right? I disagree with that, Your Honor. I believe that the force that was actually used, even if stated as the way Mr. Fugawa has stated it in his appeal, what could be considered to be reasonable as a matter of law, specifically because the force employed here, which is undisputed, is that there was an arm grab, a twist of his wrist, and a leg sweep that brought him to the ground. Now- While pushing him forward so that his face would make maximum contact with the ground. That strikes me as, at least reading the record in the light that most favorable to him, as done for the purpose of inflicting pain for no good faith reason to gain compliance. Well, Your Honor- And you have the other officer saying, no, no, no, that's not necessary. We don't need to be slamming anyone's face into the ground here. Seems to me you put those two things together and surely a reasonable jury could disagree with your interpretation of how this incident went down. Your Honor, we do need to look at the totality of the circumstance and the force that was used. Specifically, in this particular instance, Officer DeArmond's partner did break Mr. Fugawa's fall. His face was not actively slammed into the ground directly from the position that he was standing in. That's not what your client was trying to do. Again, just reading the, I'm not, we're not here to figure out who's right and who's wrong, but I'm just saying we have to read, as Judge Friedland said, the record in the light most favorable to your opponent. And he's saying that your client was very much trying to slam his face into the ground, right? That may be, Your Honor. However, there's no civil action for attempted use of excessive force. Right, so he wanted to slam his face into the ground. He didn't succeed because the other officer was being decent about it and broke Fugawa's fall, but DeArmond ended up causing different harms. And what he was trying to do, he was maliciously and sadistically attempting to restore harm. He didn't, to cause harm. He didn't cause the exact harm that he promised and threatened to do, which is to slam the face into the ground, but he did cause a different harm, which is he injured Fugawa's back. Your Honor, first, I do not believe that there's any evidence in the record regarding the extent of Mr. Fugawa's injuries, aside from Mr. Fugawa's concession that his injuries were minor. Also- Well, he says that it hurt his back and that he's had ongoing back problems. Now, you may contest the cause of that and say he already had a back problem, but if we, again, take his allegations as true, don't we have to assume it hurt his back? Your Honor, the district court actually explicitly addressed Mr. Fugawa's claims that this incident hurt his back and disregarded them because he was not qualified to offer that testimony. And to my knowledge, Mr. Fugawa has never challenged that finding and has therefore waived any ability to then argue that this injury was greater than- If I get punched in the face and then I testify, you know what? My face really hurts and the cause of my discomfort was the punch I received, do I get thrown out of court because I don't have a doctor come in and say that that was actually the cause of my discomfort? Certainly not, Your Honor. So why not the same for Mr. Fugawa? In this case, Your Honor, Mr. Fugawa has stated fairly consistently that he had a preexisting back condition and there's just no evidence that his claim that this exacerbated his back condition had any support. Now, it's a difference between stating that my back hurts and my back hurts because I have a slipped disc in the L5-S1 vertebrae or something like that. One gets you thrown out of court and the other one is just how you're feeling at the time. Now, specifically, I'd like to look at the Hudson factors as the district court considered them. As stated, the extent of the injury suffered by the inmate is undisputed that these injuries were minor, both by Mr. Fugawa and by the district court. Now, the need for application for force has been disputed by Mr. Fugawa. However, his argument appears to be that no force was necessary whatsoever. It's undisputed that Mr. Fugawa was disobeying orders, a lawful order to go to his cell and a lawful order to cuff up previously. It's also undisputed that he resisted it until he was told that he would be going to administrative segregation. And putting his arms behind his back and they cuffed him without incident. That did happen, Your Honor. It's also undisputed, however, that he was physically resisting the officers when they were attempting to bring him to his cell. And as Your Honor pointed out, prison inmates do not get to pick and choose which orders they get to follow or when they get to go to their cell. The only force that was used came immediately after Mr. Fugawa began physically resisting the officers. And as they are trained to do, they took him to the nearest surface. In this case, it happened to be the ground. Yes, that's a nice, polite way of putting what happened here. There's quite a different view of the evidence that I think a reasonable jury could take from this. He was trying to, I mean, obviously, according to the plaintiff, he was trying to, the officer was trying to punish him for giving him a hard time. He didn't want to be messing around with this guy. Viewed him as just being difficult for no good reason. And he said, you're either gonna do what I tell you or I'm gonna make you pay and you'll learn next time. And I think we have some evidence in terms of their interactions afterwards that your client, I guess, said, next time we can go all the way, right? I mean, I just don't see how you could say that a reasonable jury couldn't read the record in saying that this would have been a violation of the Eighth Amendment. That's just, I have a hard time seeing how you can defend that. Well, Your Honor, just as a matter of law, the objective amount of force that was used specifically is insufficient to show that there is anything more than the force that was needed to bring him into compliance with orders. Well, how do we know that? I mean, I asked your opponent this question about whether we have evidence about the range of options. Do you have evidence that says this is the minimum option that they had available? Your Honor, I would point to the case law. Both Hudson and Wilkins indicate that when officers are required to make split-second decisions, such as in this case, they use the force that they're trained to use. And they're allowed to use reasonable force to, under the Title 15 of the California Code of Civil, California Code of Regulations, reasonable force to gain compliance with the lawful order to affect custody or to overcome resistance. And I believe all three of those situations apply in this case. But how do we know that? I mean, maybe they had 10 other options for getting him to move forward that would have had less force. Maybe they didn't, but we don't know one way or the other, right? There's no, we don't know what their options were in terms of getting him to comply beyond slamming his face into the ground. You're standing here telling us that was the reasonable option, but how do we know that? You're correct, Your Honor. There is nothing in the record regarding the other options for force that were available. And there was also this statement that he could go into the cell and fight the other cellmate, he alleges. Is that further evidence that, what's your client's name, that Mr. Daharmand was out to get Mr. Fugawa, hoping that he gets hurt? I mean, that seems like, there hasn't been a lot of discussion of that, but it seems like perhaps another piece of evidence that the jury could use to say that somehow this officer had a problem with Mr. Fugawa. No, Your Honor. That statement was made indicating that Mr. Fugawa had not stated any reason why he could not go into that cell, aside from the apparent reason that his new cellmate was black. But the idea that if they had some conflict, the way they should resolve it is they should fight with each other? Isn't he going to get hurt that way? The fact is, Your Honor, an inmate cannot, there's no reason for an inmate to refuse a valid housing assignment, unless there's actual threat to his safety. And in this case, Mr. Fugawa has not pointed to a single threat to his safety. Well, didn't he say, didn't Fugawa say, and again, maybe he's lying. Maybe he's trying to tell the truth, but is remembering things inaccurately. But on summary judgment, we have to take what he says is the gospel. He says he went to the cell, talked to the cellmate, and he suggested that the cellmate indicated that they were incompatible. And cellmate was African-American and Fugawa was Asian. So why are you saying that it was Fugawa's decision as opposed to the cellmate's decision or understanding? Your Honor, I do remember that being in the record, and I agree with your characterization of those facts. I don't know that it really matters one way or the other, whether it was Fugawa or the other cellmate who believed that they were incompatible. And incompatibility does not all by itself necessitate or automatically mean that there was going to be some sort of threat of violence or an imminent threat. But doesn't it seem like de Armand, on his allegations, doesn't it seem like de Armand thought there was going to be physical violence? He says, go fight him then. I mean, it sounds like he assumed there was going to be physical violence. So the idea that it was somehow irrational to think there might be physical violence is undermined by the allegations about what de Armand said, right? How do you get out of that problem? Well, your Honor, Mr. Fugawa just has not been able to actually state any threat of physical violence that he actually was in fear of. And he certainly did not say that in the record that he told Officer de Armand that he had that fear. Well, isn't that what it means to say we're incompatible? Isn't the whole idea of that that we may end up fighting and we're going to get hurt? Not to my understanding, your Honor, but I'm not entirely familiar with that. Now, as to the qualified immunity question that was brought up earlier, it is certainly true that the qualified immunity analysis requires a high level of specificity to determine if the right in question was clearly established at the time. And as your Honor pointed out on questioning, Mr. Fugawa has not pointed to a single case that would have put Officer de Armand on notice. This isn't a qualified immunity case. This is a case where a jury needs to figure out who's telling the truth. Because if Mr. Fugawa is telling the truth, I think it was clearly established long before this happened that an officer can't just deliberately slam someone's face in the ground for the purpose of punishing him, right? So it's not, this has nothing to do with qualified immunity, it seems to me. It's just a question of sorting out whose version of the facts is right. If your version is right, then there's no Eighth Amendment violation. Your client's fine. If Mr. Fugawa's version is right, I don't see how we would be able to say that the officer was nonetheless entitled to qualified immunity. Your Honor, I respectfully disagree with that characterization. I believe that qualified immunity is certainly applicable to this case. Specifically, I'd point to this court's decision in Schaefer versus County of Santa Barbara, which we did address in our briefing. However, briefly, the question before the court at that point was whether an officer violates clearly established law when he progressively increased his use of force from verbal commands to an arm grab to a leg sweep maneuver when the misdemeanor refused to comply. An arrest out on the street where the person's not already restrained, right? Certainly, Your Honor. And I'm saying, you have someone here who is handcuffed and basically helpless, and the allegation is that he was, his head was forced forward while his legs were flipped out from under him so that his head would make maximum contact with the ground. There's no, that's not a good faith effort to gain compliance. That's an effort to inflict punishment on somebody, and that's what the Eighth Amendment says you cannot do. Your Honor, when an inmate explicitly refuses to obey orders and, in fact, offers physical resistance, there's no way of knowing what that inmate's going to do. Officer DeArmond is not a mind reader. He's not able to tell what Mr. Forgot was going to do. While, yes, all he managed to do before he was brought back into compliance was drag his feet, there's no way that Officer DeArmond could have known that. And he could not have known, and it was not clearly established, that twisting his arm and raising up on his feet and bringing him to the ground would have violated his constitutional rights. Now, simply citing Hudson and Wilkins, very, very general excessive force cases does not put the right in question beyond debate. As the Supreme Court has repeatedly cautioned this Court, that the right must be defined at a very high level of specificity. Here, the district court specifically said, Officer DeArmond would not have been on notice that the law precluded him from employing a brief tempered measure of physical force in the face of an inmate's noncompliance with an escort that was preceded by the inmate's noncompliance with orders. There are no material disputes of fact as to anything in that sentence. There is. That's your version of the event. If the plaintiff's version of events are believed, then that's not the way it went down. So that's what I'm saying. To me, this has nothing to do with qualified immunity. Just need a jury to sort out who's right. And you might have to go to trial to do that. Your Honor, I'd definitely point to the, point to the district court's statement of the facts, which. But the district court can't find the facts here, right? If there's, if we're looking at the same record, so we're, this is a de novo review. We don't defer to the district court's finding a fact. There was no trial here. Certainly, Your Honor. But I just simply mean the recitation of facts that the district court considered, which was generally, by and large, the plaintiff's version of events, except to the point where they were undisputed by a defendant. Now, I do see that I've run out of time. So unless the court has any further questions for me, I'm. Okay. Thank you for your argument. You have some time remaining for rebuttal. Thank you, Your Honors. Just first, I wanted to maybe correct one statement by the state just there, that Mr. Fagawa's made a concession that his injuries were minor. He hasn't made that concession. I think it's clear from the briefing that he hasn't made that concession. He has, there's testimony in the record about the short-term pain and the long-term pain that he suffered as a result of this. Tightness and pain in his back required him to squat much of the time, aching body the following day, throbbing pain up and down his leg, swollen wrists, those kinds of things in the short term. Then in the long term, he was designated as not as fit for duty immediately prior when he entered, and then designated not fit for duty right after this. He can't carry things over 25 pounds. If this were remanded for a trial, if the district court stuck to the idea that he couldn't use the back injury because of lack of medical testimony, say we just, are there other injuries that he could use to at least get nominal damages or something from this case? Yes, he has emotional distress, let's sleep with this kind of damages he offers. Also, I think it's not really correct to say that the district court threw out the back completely. What the district court says is that he needed an expert witness to come in and testify specifically as to whether the physical therapy that he was ordered and the broken vertebrae that he alleged to have was a result of the injury. There's like a causation problem. But it sounds like he'd have the hurt wrist and hurt bruises regardless of the back. Right, the short term injuries he'd have regardless of the back. I think the long term back pain, I don't know what an expert can say about that he suffers pain or not. It's his body, you know, I think he has that too. I think the specific things that the district court called out were more medical, the kind of issues of causation on specific issues like the physical therapy. And then I just want to go back to try to answer some of the questions from the first time a little maybe more clearly. I think you can infer his intent whether or not the D.R. Mahon is intending to gain compliance with an order or intending to cause harm from his statements. And we mentioned those obviously in the briefing, but some of them came up in the response of questioning. The takeoff on comment when the issue was first raised by Mr. Fugawa that he's incompatible and that he fears for his safety. And he did, his testimony is that he raised the safety issue immediately with Mr. D.R. Mahon and that Officer Villa seemed to understand it and for that reason was gonna assign him to a different cell. And then the threat during the, obviously the threat during the actual incident that he's gonna slam his face in the ground would be another statement of Mr. D.R. Mahon's that a reasonable jury could infer his intent to just sort of cause harm. And then I think also the statements in Mr. Fugawa's brief about what happened afterwards when he's trying to dissuade him to file anything, suggesting he's gonna go all the way next time or whatever the exact words were. I think those things you could infer an intent just to cause harm. So I think also on your question about the other options that they had, I think that's a question for the jury. You know, what could have else been done? And then on the Schaefer case that the state mentioned, I think that's obviously different. He's, this is a party in Santa Barbara where there's this kind of like a melee outside and he's trying to get an understating guy to be restrained. Obviously the big difference here is that he's voluntarily submitted to have his hands tied behind his back, so. Okay. Thank you, counsel. Thank you, your honor. And let me thank, on behalf of the court, let me thank both of you for your willingness to take this case pro bono. Really appreciate your service to the court. You've done a terrific job. I thank the state for your arguments as well. Okay. The case just argued will be submitted and we will take a 10, whatever, five minutes. Recess, before we hear the last case.
judges: Watford, Friedland, Feinerman